[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In 1819, Chief Justice John Marshall opined: ". . . . power of taxing the people and their property is essential to the very existence of and may be legitimately exercised on the objects to which it is applicable, to the extent to which the government may choose to carry it." McCullochv. Maryland, 17 U.S. 316 (1819). In like vein, Justice Stephen Field later stated: "A municipality without the power of taxation would be a body without life, incapable of acting, and serving no useful purpose."United States v. New Orleans, 98 U.S. 381, 25 L.Ed 225 (1878). But if the life-blood of government is its ability to impose taxes, that power when run amuck also co stitutes the power to destroy. So said Chief Justice Marshall in McCulloch. Similar words w e used contemporaneously by Justice Jeremiah Brainard of the Connecticut Supreme Court. In Atwaterv. Woodbridge, Justice Brainard opined: "Taxation may be a worm at the ro t, which, in its consequences, may destroy both root and branch." CT Page 54666 Conn. 223, 230 (1826). Unlike either McCulloch or Atwater, this case is not about the right of government to tax but rather it is about the reasonable exercise of government's power to tax its citizens. Like bothMcCulloch and Atwater, this case implicates the destructive potency of gove ent when it misuses its taxing authority. While comprising several lawsuits raising multiple issues, this case, in sum, is an appeal by the plaintiffs from personal property assessments and consequential taxes imposed on them by the defendant municipality for the tax years 1991 through 1999.
The plaintiffs are public utility companies subject to state and federal regulation. In Connecticut, they are regulated by the Department of Public Utilities Control (DPUC). Within the state, the plaintiff Yankee Gas Services Company (Yankee)serves approximately 200,000 customers in 60 cities and towns and the plaintiff Connecticut Light 
Power Company (CLP) provides electric service to approximately 1.7 million customers in 160 municipalities. There are approximately 57,000 residents qf the city of Meriden, including approximately 1,600 business property owners. Both plaintiffs provide services to Meriden and maintain taxable personal property within the City.
While the DPUC regulatory reach over the plaintiffs is broad, pertinent to this case is the DPUC's rate-making authority. In the regulatory sense, the tenn "rate" is used to define, as a percentage, the rate of return a utility company is permitted to earn on its rate base. In determining this rate, the DPUC considers the need for a utility to recover its reasonable operating expenses and its capital costs, and a reasonable opportunity to earn a fair return on investment. In regulatory parlance, rate base is comprised, in large part, of the utility's net cost of plant in service. Therefore, in order to fix a maximunti allowable rate of return, the DPUC must first determine the net costs of a utility's regulated assets, based on the assets' original costs less accumulated depreciation. In conjunction with this process, the DPUC requires the utility company to submit a description of its regulated assets, which includes information regarding original costs, dates of service, deferred taxes, and data regarding retirement. In conjunction with this process, the DPUC the allowable depreciation. In order to calculate allowable depreciation by category, the DPUC periodically conducts depreciation studies to determine the actual life history and reasonable life expectancy of regulated assets. It is on the basis of these studies and not on Internal Revenue schedules that the DPUC determines the amount df depreciation, by asset category, it will allow in setting a utility's rate base. Once a rate base is calculated, the DPUC then sets a maximum allowable rate of return. This process involves a consideration of the cost of debt to the utility as well as a reasonable return on required to have funds to purchase and maintain CT Page 5467 assets in service.
As property owners in Meriden, the plaintiffs are required by the terms of C.G.S. § 12-43 annually to submit a listing of their tangible personal property located in Meriden.
Procedurally, each year Meriden sends each business property owner a form on which the business is asked to report its personal property. Although njunicipalities have the authority, subject to approval, to utilize a specialized assessment form, Meriden has traditionally used the personal property reporting form prescribed by the Office of Policy and Management pursuant to its statutory authority relating to municipal taxation.[1] While the specific language of the form has changed from time to time, for each of the years in dispute, the Meriden form required personal property owners to indicate 1ie costs of acquisition and the amount of claimed depreciation for taxable personal property. Although the form includes depreciation schedules for various categories of property as allowed by the Internal Revenue Service, for its regulated assets the plaintiffs have historically claimed only the depreciation as determined by the DPUC and the plaintiffs do not claim depreciation of regulated assets below thirty percent (30%) of original costs.[2]
For the grand lists of 1991-1994, the plaintiffs filed ersonal property declarations as required by C.G.S. § 12-43. The assessor assessed the listed property and signed and recorded the grand list. The tax collector issued tax bills on1 the assessments and the plaintiffs timely paid the bills for each year. On August 3, 1994, Meriden notified the plaintiffs that they were being audited pursuant to C.G.S. § 12-53 for the tax years 1991 through 1994. Audit hearings were held on November 29, 1994 and August 30, 1995. Meriden sent the plaintiffs a notice dated September 28, 199 with an attached summary of audit adjustments to the 1991-1994 grand lists. Meriden iss ed new tax bills resulting from the audit dated November 16, 1995. The plaintiffs appealed to the Board of Assessment Appeals for the City of Meriden pursuant to C.G.S. § 12-111. The Board denied the plaintiffs' appeals.
For the tax years 1995-1999, the plaintiffs filed their declarations as required. The assessor increased the assessment each year pursuant to § 12-55 and signed and recorded the grand list. The plaintiffs appealed to the Board each year pursuant to § 12-111. The Board elected not to hold hearings and denied the plaintiffs' appeals.[3]
The plaintiffs paid seventy-five percent of the assesed taxes under protest in accordance with § 12-117a. As discussed infra, the taxpayers are aggrieved, and they have appealed to this court for relief. CT Page 5468
The plaintiffs brought eight tax appeals, pursuant to C.G.S. §12-117a, following the Meriden Board of Tax Review's denial of the plaintiffs' appeals from the City's reassessment of its personal property for the tax years 1991 through 1999. The plaintiffs have also filed an action for wrongful assessment, pursuant to C.G.S. § 12-119, for the tax years 1991 through 1998, claiming that the taxes assessed against the plaintiffs were manifestly excessive and imposed in disregard of the statutes regarding the valuation of such property. The plaintiffs further claim that a valuation agreement between Northeast Financial Management Associates (NFMA) and the city of Meriden violates public policy, that their due process and equal protection rights were violated and that the City's conduct amounts to a civil conspiracy. Meriden filed six special defenses to the § 12-119 claim. The first five special defenses are based upon Meriden's assertion that the plaintiffs' payment of taxes under protest, which was required to preserve their rights under §12-117, bars the § 12-119 claim which allows application for relief to the superior court "prior to the payment of such tax." The sixth special defense asserts the doctrine of unclean hands. Meriden also filed counterclaims against the plaintiffs for failing to pay the taxes as assessed under § 12-53 and § 12-55. The nine cases were consolidated and tried to the court on December 19, 2000 and subsequent dates.
C.G.S. § 12-119 allows a taxpayer to bring a claim that the tax was imposed by a town that had no authority to tax the subject property, or that the assessment was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of property. "Our case law makes clear that a claim that an assessment is "excessive is not enough to support an action under this statute. Instead, § 12-119 requires an allegation that something more than mere valuation is at issue. Second Stone RidgeCooverative Corp. v. Bridgeport, 220 Conn. 335, 339-40 (1991); accordConnecticut Light Power Co. v. Oxford, 101 Conn. 383, 392 (1924)" (Internal quotation marks omitted.) Pauker v. Roig, 232 Conn. 335, 339
(1995).
The first category in § 12-119 "embraces situations where a tax has been laid on a property not taxable in the municipality where it is situated." E. Ingraham Co. v. Bristol, 146 Conn. 403, 408, 151 A.2d 700, cert. denied, 361 U.S. 929, 80 S.Ct. 367, 4 L.Ed.2d 352 (1959). This category is not applicable to the facts of this case.
"The second category consists of claims that assessipents are (a) manifestly excessive and (b) . . . could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of the property. E. Ingraham Co, 146 Conn. at 409. Cases in CT Page 5469 this category must contain allegations beyond the ere claim that the assessor overvalued the property. [The] plaintiff . . . must satisfy the trier that [a] far more exacting test has been met: either there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty on their part. Mead v. Greenwich, 131 Conn. 273, 275
(1944). Only if the plaintiff is able to meet this exacting test by establishing that the action of the assessors would result in illegality can the plaintiff prevail in an action under § 12-119. The focus of § 12-119 is whether the assessment is illegal. Cohn v. Hartford,130 Conn. 699, 703, 37 A.2d 237 (1944). The statute applies only to an assessment that establishes a disregard of duty by the assessors. L. G.DeFelice Son, Inc. v. Wethersfield, 167 Conn. 509, 513, 356 A.2d 144
(1975)." (Citations omitted; internal quotation marks omitted.) SecondStone Ridge Cooverative Corp., 220 Conn. at 341-42.
On July 1, 1994, the defendant Meriden entered into a valuation audit contract with NFMA for services in conjunction with an audit of personal property belonging to businesses in Meriden. The agreement provided for Meriden to select a minimum of four hundred business accounts to be audited. According to the (then) tax assessor, Steven Hodgetts, there were approximately sixteen hundred businesses with taxable personal property located in Meriden. Hodgetts identified the upper half in terms of value of personal property, and from this group he randomly selected a percentage of the businesses for audit. Both plaintiffs were chosen. This manner of selection is consistent with Meriden's avowed aim in this audit initiative to increase its tax revenues. The second paragraph of the valuation audit agreement commences with the following sentence: "the background of this Agreement is that the City is seeking to maximize its revenues from the taxation of personal property owned by businesses located within the City."
The contract between NFMA and Meriden called for NFMA to provide audit services for which NFMA was to be compensated through a contingency fee arrangement based upon a percentage of the additional tax revenues, including interest and penalties, actually collected by the City as a result of the contemplatd audit.[4] Additionally, the contract contained a provision preventing the City from compromising any claim for the payment of increased taxes with any audited business without first giving NFMA a "meaningful opportunity to participate in discussions between the City and such Account with respect to such matters."
At the time Meriden and NFMA entered into this a eement, neither NFMA nor any of its employees was certified as a "revaluation company" pursuant to C.G.S. § 12-2c. That statute provides, in pertinent part: "On and after June 25, 1991, no revaluation company shall perform any CT Page 5470 valuation for a municipality for assessment purposes unless such company is certified by the Secretary of the Office of Policy and Management." James Crozier, who is a principal of NFMA, testified that he is not an appraiser and has had no personal experience in valuing utility property. Similarly, Jeffrey Coulson, another NFMA principal at the time, was not certified to conduct revaluations and was not a licensed appraiser. At a later point, in 1998, Mr. Coulson obtained certification pursuant to § 12-2c The defendant's retention of NFMA for the § 12-53 audit violated the proscription of the statute. The taxing authority of a municipality must be exercised in strict conformity to the terms in which the authority is given to a municipality. Pepin v. Danbury, 171 Conn. 74
(1976). While exact conformity with every statutory procedure for assessment is not necessarily a condition precedent to a valid tax, where a statute's requirements are found to be mandatory and not merely directory, strict adherence to the statute is required. cf McQuillan,Municipal Corporations, 3rdEd., (Clark, Boardman Callahan, New York, 1994) at 44:106. In the court's view, the unambiguous language of §12-2c is proscriptive, mandatory, and it is intended for the protection of the public. Meriden's violation of this statute is one basis for a finding that the audit process was unlawful.
In order to perform NFMA's obligations under this contract, Crozier contacted Donald Swanton and John Parker whom he viewed as utility experts. On January 24, 1995, NFMA and Swanton and Parker executed a document entitled, "Master Consulting Agreement" which set forth the general terms of their anticipated business relationship and which stated that Swanton and Parker would receive as compensation thirty-three percent of NFMA's earnings from the audit. This agreement also contemplated, by its own terms, that the parties would later execute individual contracts related to specific audits. Also on January 24, 1995, NFMA, Swanton and Parker entered into supplemental agreement relating specifically to the audit of Northeast Utilities, Yankee Gas, and CLP. This later agreement states, in part:
 "NFMA has entered into an Agreement ("the Audit Agreement") dated July 1, 1994 with the City of Meriden, Connecticut (the "City"), pursuant to which NFMA is to provide certain personal property tax audit services. NFMA hereby engages Consultant, and Consultant hereby agrees, to perform audit services on behalf of the City as specified in the Master Consulting Agreement."
In spite of the language of the contract obligating them to provide audit services, neither Parker nor Swanton was, in fact, asked to do an audit. Rather, they were asked to perform a specific task, namely, a CT Page 5471 reproduction cost new less depreciation (RCNLD) study of the plaintiffs' properties. In short, neither Swanton nor Parker was asked to find omitted property or value or to determine the fair market value of the plaintiffs' properties for any of the audit years. Both Parker and Swanton testified that neither of them performed an audit of the plaintiffs' personal property for any of the tax years involved, and that neither of them appraised the plaintiffs' property to determine its fair markel value. Swanton characterized his work as a very rough estimate and not an appraisal. He also acknowledged that he had never in his career done a property tax valuation involving utility property. He reported that he did not consider the fact that the property was regulated by the DPUC because such an analysis was beyond the scope of their work. He and Parker were simply directed to prepare a study based on one valuation methodology.
Pursuant to the request of Meriden's then assessor, Hodgetts, the plaintiffs provided substantial documentation to Parker and Swanton from which they prepared their RCNLD study. The results of this study were forwarded to NFMA. Without conducting any further examination or independent analysis, Crozier prepared executive summaries of Parker and Swanton's work and forwarded the summaries to the assessor as NFMA's work product pursuant to its valuation audit agreement. Thinking erroneously that NFMA had hired utility experts to determine the fair market value of the plaintiffs' properties, Hodgetts accepted the NFMA product without independent analysis on his part. Based on the executive summaries prepared by Crozier, Hodgetts prepared and sent revised tax bills to the plaintiffs for the audit years 1991, 1992, 1993, and 1994.
The tax bill for 1991 was based on the RCNLD study conducted by Swanton and Parker. For 1991, the original Yankee Gas assessment was $8,664,610. As a consequence of the NFMA report, the City increased the assessment to $25,330,230, approximately 2.92 times the original amount. For CLP while the original assessment for 1991 was $13,439,680, the increased assessment was $25,811,860, approximately 1.92 times the original amount. Without asking for additional information from either plaintiff for any of the audit years 1992 through 1994, the assessor simply multiplied the amount reported by each plaintiff for each of these subsequent years by the factors noted to arrive at his determination of the value of the plaintiffs' personal property in Meriden for the tax years 1992, 1993, and 1994. Thus, for 1992, while Yankee Gas reported a value of $10,768,280, the assessor simply multiplied that amount by 2.92 to arrive at a new assessment of $31,480,120. Similarly, for the audit year 1993, while Yankee's initial assessment was $14,661,670, the tax assessor raised it to $42,862,100 by simply multiplying the reported valuation by the constant factor of 2.92. In 1994, the original assessment of $14,879,720 became $43,499,550.[5] The assessor went through a similar calculation for CLP for 1992, 1993, and 1994, and then CT Page 5472 issued a tax bills for higher amounts based solely on multiplying each year's previous assessment by a factor of 1.92. Thus, while CLP's initial assessment for 1992 had been $14,796,060, it became $28,416,880 and for 1993 the original assessment of 14,812,190 became $28,447,860. In 1994, the original assessment of $13,933,990 became $26,781,210. In formulating new assessments, the assessor made no determination whether either plaintiff had added or subtracted assets from their business property in Meriden in 1992, 1993 or 1994. No information in this regard was requested from either plaintiff Indeed, it is evident that beyond the initial information requested by NFMA pertaining to the 1991 filing, no further information was requested from either plaintiff by either the City or NFMA in any of the subsequent tax years in dispute. The defendant's argument that the plaintiffs are not entitled to complain of their assessments because they failed to provide required information to the defendant is Without merit not only because the plaintiffs did, in fact, provide substantial information in support of their filings but because it is evident that the defendant had no interest in backup data for any of the tax years subsequent to 1991.
From the trial, it is evident that Crozier advised Hodgetts to use a factor for each plaintiff for audit years 1992, 1993 and 1994 without considering any additions or retirements in the plaintiffs' personal property after 1991, arid Crozier's advice was based on a conversation with Swanton. Swanton had suggested to Crozier that NFMA utilize a trending factor for years subsequent to 1991 since doing a complete analysis of the actual asset inventory for each of the audit years would, in his view, have been too repetitive. Although Swanton suggested to Crozier that he use a trending factor for subsequent years, he did not recommend using an identical factor for each year. According to Swanton, the use of a constant factor in each of the subsequent years must have been Crozier's idea. Although the use of trending factors to determine the reproduction or replacement cost of property is an acceptable methodology when using the RCNLD approach to valuation, trending assumes that the property, its acquisition costs, and its age, have all been identified. NFMA's use of a constant factor for 1992, 1993, and 1994 based solely on the 1991 profile of assets without regard to any changes for the later years was an unreasonable shortcut.
For the tax years 1991 through 1994, the Meriden tax assessor abdicated his responsibility to conduct an audit pursuant to C.G.S. § 12-53 He was unaware that NFMA had no expertise in valuing utility property, and that its out ide experts had been directed not to conduct an audit or appraisal but simply to prepare a RCNLD study. He relied on the results forwarded by NFMA on the basis of ignorance and failure to make independent inquiry of the scope and results of the NFMA work. NFMA conducted neither an audit nor an appraisal of the plaintiffs' property CT Page 5473 in any of the audit years. The assessor's unquestioned reliance on NFMA's work amounted, in this case, to an abdication of his responsibilities to audit and value the plaintiffs' properties for the tax years 1991 through 1994. While an assessor has the authority to retain outside experts to assist in the assessment of property, and he need not personally inspect all the assessed property, he or she retains the responsibility to exercise the final judgment in determining the amount of the assessment.McQuillan at 44:102; Conzelman v. City of Bristol, 122 Conn. 218 (1936).
The plaintiffs additionally claim that the assessments for the tax years 1991 through 1994 were unlawful because the assessor changed the valuation methodology. For the tax years 1991-1994, the assessor sent to the taxpayers of Meriden, including the plaintiffs, a declaration requesting the taxpayer to report its property based on original cost less depreciation (OCLD). The assessor used OCLD in initially ssessing the plaintiffs' property, signed the grand lists and issued tax bills accordingly. In the audit, Meriden changed the valuation methodology to RCNLD.
C.G.S. § 12-53 gives assessors the authority to add property that the taxpayer omitted or to revalue property already listed. UnitedIlluminating v. New Haven, 240 Conn. 422 (1997). As the statute existed throughout the tax years involved in this case, it made no mention of valuation methodologies. In 1999, the following language was added to § 12-53(c): "The methodologies used to determine the value of such property during such audit shall remain consistent with the methodologies requested by the assessor to determine the value of such property for the grand list year which such au it or audits relate." The plaintiffs contend that this language should be applied retro pectively. Meriden disagrees.
"In determining the intended effect of a later enactm nt on earlier legislation, two questions must be asked. `First, was the act intended to clarify existing law or to change it? Second, if the act was intended to make a change, was the change intended to operate retroactively?' . . .Circle Lanes of Fairfield, Inc. v. Fay, 195 Conn. 534, 540, (1985)."Anderson Consulting, LLP v. Gavin, 255 Conn. 498, 517 (2601).
"Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. In order to determine the legislative intent, we utilize well-established rules of statutory construction. Our point of departure is C.G.S. § 55-3, which states: No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retroactive effect. The obligations referred to in the statute are those of CT Page 5474 substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. Coley v. Camden Associates, Inc.,243 Conn. 311, 316, 702 A.2d 1180 (1997). This presumption in favor of prospective applicability, however, may be rebutted when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively. In re Daniel H., 237 Conn. 364, 372, 678 A.2d 462
(1996); accord Bayusik v. Nationwide Mutual Ins, Co., 233 Conn. 474,483-84, 659 A.2d 1188 (1995); Miano v Thorne, 218 Conn. 170, 175,588 A.2d 189 (1991). Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect. . . . Toise v. Rowe, 243 Conn. 623, 628, 707 A.2d 25 (1998). We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect." Colonial Penn Ins, Co. v. Bryant,245 Conn. 710, 717-19, 714 A.2d 1209 (1998).
The language contained in the legislative history of the P.A. 99-189
provides a strong indication that the legislature intended to clarify rather than to change the law governing municipal tax audits. The title of P.A. 99-189 was "An Act Concerning Technical Changes and Clarifications to the Assessment of Personal Property." The stated purpose of the act was "To clarify provisions related to the assessmen of personal property for purposes of municipal taxation, to change statutory references so as to reflect the distinction between the total net assessment of all taxable property and the gross fair market value of personal property and to clarify the duties of boards of assessment a peals with respect to supplemental additions to a grand list."
A reading of the transcripts of the public hearings a so suggests thatP.A. 99-189 was a mere clarification of the law which was already in practice prior to its enactment and that P.A. 99-189 represented the existing practice and understanding of those involved in municipal taxation. Hodgetts, speaking as the president of the CAAO, states that the bill "clarifies a lot of the gray areas of the statutes." Conn. JointStanding Committee Hearings, Finance Revenue and Bonding, Pt. 224, 1999 Sess., p. 382. Steven Kosofsky, the Legislative Committee Co-Chair of the CAAO characterized the changes as "primarily technical in nature." Id. at 549. The Connecticut Conference of Municipalities characterized the bill as a clarification and standardization of the assessment of persor al property, including declaration procedures, audit procedures and appeals procecdures. Id. at 539.[6]
Nowhere in the legislative history is it suggested tha P.A. 99-189 represented a substantive change in the law. Accordingly, inferences by the legislators and the various speakers that the amendment clarifies existing law signify legislative intent regarding the retroactivity of the amendment. see, e.g., Oxford Tire Supply v.CT Page 5475Commissioner, 253 Conn. 683, 692 (2000); Connecticut National Bank v.Giacomi, 242 Conn. 17, 40-41 (1997); Edelstein v. Dept. of Public Health Addiction Seryices, 240 Conn. 658, 668 (1997). "`[W]here it is clear that an amendment was intended to construe and clarify, rather than alter, a preexisting law, it will be treated as retroactive.'" Thomas E.Golden Realty Co. v. Society for Savings, 31 Conn. App. 575, 579 (1993), quoting Aetna Casualty Surety Co. v. Lighty, 3 Conn. App. 697, 703
(1985). For the foregoing reasons, the court finds that the legislature intended P.A. 99-189 to be retroactive.
It was inappropriate for the defendant to have changed valuation methodology in conjunction with its C.G.S. § 12-53 audit of the plaintiffs' personal property for the tax years 1991 through 1994.
For the tax years 1995 through 1998, the assessor in reased the self-reported valuation of the plaintiffs' personal properties pursuant to hi statutory authority under § 12-55. His process was elegant and simple. It was also unique. For each of the tax years, without any review of the plaintiffs' personal property to determine whether there had been any additions or deletions, the assessor multiplied the amount reported by Yankee by a factor of 2.9 and the amount reported by CLP by a factor of 1.9. He testified at trial that he utilized these factors for the sake of consistency and upon advice of counsel because of the pendency of tax appeals in court. Thus, for the tax years 1995 through 1998 the assessor arbitrarily increased the self-reported valuations of the plaintiffs' property by constant factors without regard to any increases or decreases to the plaintiffs' property profile in Meriden. Decisional law reveals that courts have accepted many valuation methodologies. Legal expedience, however, has not previously met with judicial approbation as one such method. In arbitrarily increasing the valuation of the plaintiffs' properties for the tax years 1995 through 1998 for reasons of legal expediency, and without regard to the property itself, the assessor abdicated his lawful responsibilities to determine the fair market value of the subject property.
The plaintiffs further claim that the assessments for the tax years 1991 through 1998 are unlawful because they were denied their state and federal constitutional rights to the equal protection of the law and to due process.
It is axiomatic that a just assessment process is one (vhich is uniform and uniformity requires that similarly situated tax payers be treated equally without discrimination. Hanover Fire Insurance Comvany v.Harding, 272 U.S. 4911. (1926). That is not to say, however, that all classifications are barred by equal protectiLn considerations. "Classification of persons or property, or both, for taxing purposes is CT Page 5476 sanctioned provided, of course, that such classification is fair, reasonable and not or whimsical, and based on substantial distinctions."Id.
The application of those principles to this instance means that if the property of one or two taxpayers is to be valued according to a method employed for no other businesses, there should be a reason relating to the particularly affected tax payers to justify their unique treatment. This is particularly true when the resulting assessment is substantially greater than it would have been if the property had been assessed in the same manner as all other business property. In Meriden, however, this did not occur. From the trial evidence it is clear that for the operative years, the only taxpayers whose property was taxed on the basis of RCNLD were the plaintiffs. There is no reasonable basis for Meriden to have taxed the plaintiffs, and no other taxpayers, on the basis of RCNLD. This view is held by the defendant's experts who supported the RCNLD method. In their view, this is the appropriate method to tax all personal property, regardless of whether or not it is regulated, and there was no particular reason to use this methodology assessing the plaintiffs and not other businesses' property. The defendant offered no credible evidence to support its unique and uneven treatment of the plaintiffs. In its audit process for the tax years 1991 through 1994 no other taxpayers were assessed on the basis of RCNLD. Similarly, no Meriden taxpayers, other than the plaintiffs, were assessed according to this methodology for any of the tax years 1995 through 1998. By unreasonably singling out the plaintiffs for this unique treatment resulting in substantially greater taxes, the defendant discriminated against the plaintiffs, and in doing so, the defendants denied the plaintiffs the equal protection of the law in violation of both the state and federal constitutions.
The plaintiffs claim that the assessment process denied them due process. The power to tax is quasi-judicial. Hagar v. Reclamation DistrictNo. 108, 111 U.S. 701 (1993). There can be no dispute that a taxpayer has a property interest in his or her money. Therefore, the municipal taxing process implicates due process considerations, and when a municipal officer conducts a property assessment, due process requires that the assessor act impartially and without bias. Simard v. Board of Educationof the Town of Groton, 473 F.2d 988 (2nd Cir. 1973); TransportationGeneral, Inc. v. Insurance Department, 36 Conn. App. 587 (1995). When government acts to take property from a citizen due process requires a fair hearing. Sekor v. Board of Education, 240 Conn. 119 (1997). As noted by our Appellate Court: "Due process for those with protected property rights requires an impartial administrative adjudicator." Petrowski v.Norwich Free Academy, 2 Conn. App. 551 (1984). Accordingly, the individual assessing taxes must be free from any pecuniary interest in the resulting taxes paid. It is clear to this court that the risk of a CT Page 5477 due process violation is inherent in paying those involved in the property tax assessment process based on the amount of taxes assessed or collected. A contract that gives a party engaged in determining the tax liability a direct financial interest in the amount of tax assessed gives that party an incentive to recommend the highest possible property values. This bias deprives the taxpayer of his constitutional right to an impartial adjudicator and his right t due process. This right has long been recognized. See Tumey v. Ohio, 273 U.S. 510 (1927).
In this case, the fairness and impartiality of the process was fatally compromised by the terms of the contract between Meriden and NFMA and the consequent behavior of the parties to it. By awarding NFMA a contract which rewarded NFMA for any increased tax collections, the defendant created at least the appearance of bias in favor of increased assessments. By yielding to NFMA the right to participate in hearings and to be consulted by Meriden before the resolution of any tax dispute, the tax assessor lost his claim to impartiality. Rather, because of his admitted ignorance regarding the proper method to tax regulated utility assets, he looked to NFMA for direction and, in fact, relied entirely on their report. The lack of due process for the plaintiffs was for the tax years 1991-1994 by the refusal of Meriden to afford the plaintiffs meaningful hearings without the participation of NFMA, and, in all of the tax years, by the failure of the assessor to independently exercise his statutory responsibility to asses the properties. As a consequence, the plaintiffs were, in fact, denied due process.
The defendant argues by way of special defense that the plaintiffs' payment under protest of seventy-five percent of the assessed tax bars them from bringing a claim under § 12-119. This argument is without merit. While § 12-119 permits a taxpayer to bring suit without paying a disputed tax, nowhere does the statute prevent a compliant taxpayer from paying a disputed tax, or a portion of it, in order to preserve a claim that the tax is unlawful or manifestly excessive. A fair reading of the statute leads the court to the belief that its language permits a taxpayer to appeal an unlawful tax without making any payment, such as, for example, in a situation in which the taxpayer claims the property is not located within the taxing jurisdiction, but the refusal to pay any taxes is not a prerequisite to the availability of § 12-119 relief. The view urged by the defendant, if proper could result in the failure of a taxpayer seeking § 12-119 relief to pay any taxes even where the property is properly subject to taxation. Such a construction would serve no public policy known to the court.
For the reasons stated, the assessments of the plaintiffs' personal property for the tax years 1991 through 1998 were unlawful and manifestly excessive. Having concluded that the assessments are unlawful, the court CT Page 5478 may provide relief as it believes just and equitable pursuant to §12-119. The plaintiffs have also filed claims pursuant to § 12-117a
which allows the court to value the property de novo. The court finds this to be the appropriate relief Accordingly, in this instance the principal relief under the two statutes is the same.
In a § 12-117a appeal, the court performs a two-step function. The court must first determine whether the plaintiffs are aggrieved. Sibleyv. Middlefield, 143 Conn. 100, 105, 120 A.2d 77 (1956). Whether a specific action that the assessor takes in his valuation has aggrieved a taxpayer is a question of law. Nader v. Altermatt, 166 Conn. 43, 55,347 A.2d 89 (1974). "Valuation of property in excess of fair market value is not the only ground upon which a taxpayer may be entitled to relief. Any circumstances indicating that a disproportionate share of the tax burden is being thrust upon a taxpayer would warrant judicial intervention." Chamber of Commerce of Greater Waterbury, Inc. v.Waterbury, 184 Conn. 333, 336, 439 A.2d 1047 (1981). A demonstration that the plaintiffs have been treated unfairly or that the assessment or the methodology employed by the assessor was wrongful is sufficient to establish aggrievement. see Davis v. Westport, 61 Conn. App. 834 (2001). Based upon the foregoing findings of fact, the assessor's abdication of his responsibilities and the unorthodox valuation methodology employed, the court finds that the plaintiffs have been aggrieved for the years 1991-1998.
For the tax year 1999, Meriden retained the valuation firm of RW Beck to value the plaintiffs' property. Nancy Hughes, a senior director of RW Beck, did a fair market value analysis of the plaintiffs' properties in Meriden for 1999. With respect to Yankee Gas, while she reviewed data concerning original and reproduction costs of property, comparable sales, and the income of Yankee, she determined the most accurate measure of the value of Yankee's property in Meriden could be determined by the stock and debt approach. Her report was provided to the tax assessor, Mordarski, on the same day as he was required to sign the grand list. The court disagrees with the propriety of this approach in valuing tangible personal property in this instance. The stock and debt approach is a variant of the income method of valuation, based, in large part, on the value of the company's stock. Since Yankee was involved in a stock transaction at the time of valuation, Hughes believed it appropriate to utilize the stock share value as a beginning point in her estimate of market value. Her ultimate estimate of value was derived by a formula which did not take into consideration that a portion of the stock price reflects the value of a going business including its intangible assets such as good will and its work force. Therefore, by utilizing stock value as a factor in valuation, Hughes impermissibly included the value of intangible assets in determining the fair market value of Yankee's CT Page 5479 personal property for tax purposes. The court rejects her analysis as flawed.
For CLP, she utilized four methodologies in her study: OCLD, RCNLD, comparable sales, and income. Her study resulted in an uncertain fair market value ranging from approximately $23,000,000 to $72,000,000. Without conducting any independent analysis or selecting any particular valuation methodology, the assessor took the average of the four values to posit the fair market value of CLP's property for the tax year 1999. Mordarski was unable to provide the court with any authority, either in the law or in assessment normalcy, for this unusual mathematical approach to assessing the personal property of Meriden taxpayers. The plaintiffs are aggrieved for the tax year 1999.
Once aggrievement is established, the court may proceed to the next step in a § 12-117a appeal to determine de novo the true and actual value of the taxpayer's property. Konover v. Town of West Hartford,242 Conn. 727, 699 A.2d 158 (1997). "The trier arrives at his own conclusions as to the value of land by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value including his own view of the property." O'Brienv. Board of Tax Review, 169 Conn. 129, 136, 362 A.2d 914 (1975).
In assessing property for tax purposes, a municipal tax assessor is charged to determine the present true and actual value of the property which is statutorily defined as the fair market value of the property and not its value at a forced or auction sale. cf C.G.S. § 12-63. "Fair market value" in this context is defined as the value that would be fixed in fair negotiations between a desirous buyer and a willing seller, neither under any undue compulsion to make a deal. Uniroyal, Inc. v.Middlebury Board of Tax Review, 174 Conn. 380 (1978). If a tax assessor is unable to determine the fair market value of property because there is no apparent market for the property, then the assessor may resort to other methods for the determination of the property's value. Typically, these methods can include a consideration of the replacement or reproduction cost of the property with adjustments for depreciation (RCNLD), its original cost less accumulated depreciation (OCLD), and a capitalization of income. In reviewing the methods for determining the fair market value of property, the court is not bound to view one approach as controlling, but rather should consider all methods utilized in arriving at the value of the property. New Haven Water Co. v. Board ofTax Review 166 Conn. 232 (1974).
In assessing the plaintiffs' personal property, the Meriden tax assessor does not appear to have consistently adopted any one method for CT Page 5480 at the tax years involved. As noted, in conjunction with the 1994 audit of the tax year 1991, Meriden utilized the NFMA report, which was based on the RCNLD methodology for the 1991 tax year. For subsequent tax years through 1998, the tax assessor simply multiplied the amounts reported by the plaintiffs by constant factors without regard to any additions or subtractions to the plaintiffs' property in those subsequent years. For 1999, the assessor accepted RW Beck's valuation of the Yankee property based on a stock and debt analysis, and the assessor averaged the figures provided by RW Beck relating to CLP.
Though the plaintiffs initially reported their personal property on the basis of OCLD, for trial purposes, they presented expert testimony through John Goodman that the valuation of the plaintiffs' property should be on the income basis, supported by a variant of RCNLD methodology. For trial purposes, RW Beck, utilizing data provided by Goodman, also valued the plaintiffs' property for the 1991 tax year on the basis of RCNLD. However, the RCNLD approach of the experts and NFMA were no more than nominally similar.
As noted supra, NFMA did not, in fact, determine a valuation of the plaintiffs' property for the tax year 1991. But experts retained by NFMA did perform an RCNLD study for 1991, which became the work product of NFMA and the basis of the assessor's audit valuation for 1991 through 1994. In order to conduct this study, Swanton and Parker reviewed the personal property tax filings and backup data supplied by the plaintiffs. By utilizing a reference guide known as the Handy Whitman Index, Swanton and Parker determined the current costs of each category of the plaintiffs' personal property and then applied depreciation schedules to arrive at the present value of each asset category. They entitled this method the "Current Depreciated Replacement Cost Method." Through this process they determined that the current depreciated replacement costs of the CLP personal property in 1991 in Meriden was $36,874,088, approximately 192% of the value reported by CLP. With respect to Yankee Gas, employing the same methodology, Swanton and Parker determined the RCNLD of its 1991 assets in Meriden to be $36,186,036, or approximately 292% greater than reported y Yankee in its 1991 filing.
In its review of this matter, RW Beck utilized RCNLD for the 1991 tax year. Notwithstanding the nominal identity of its methodology, RW Beck's conclusions for 1991 vary from the determinations made by Swanton and Parker. For 1991, RW Beck determined the fair market value of CLP's Meriden personal property to be $40,985,000 and Yankee's property to be $33,371,000. Applying a similarly named method, the plaintiffs' expert, Goodman, arrived at significantly different valuations for the plaintiffs' property for the 1991 tax year. For CLP, Goodman determined the fair market value of its Meriden personal property to be CT Page 5481 $20,566,035, and for Yankee his 1991 value was $13,248,446. Goodman's approach includes deducting economic or external obsolescence in order to arrive at an estimated fair market value of regulated assets. While a significant amount of the differences in results among Goodman and RW Beck's and Swanton and Parker's work efforts can be attributed to Goodman's inclusion of external obsolescence as a component of depreciation, when this factor is omitted from Goodman's analysis, the results remain significantly different. Goodman's figures for 1991, not taking external obsolescence into consideration, were $49,722,491 for CLP and $42,462,284 for Yankee. Applying the nominally identical method of RCNLD, the three efforts reaped significantly different results with a variance of nearly $24,000,000 for the CLP valuations and a slightly more than $17,000,000 variance between the high and low valuations for Yankee. Utilizing essentially the same original cost figures, the varying outcomes were due, in large part, to differences in how each calculated depreciation. Additionally, Goodman's figures were further lowered by his inclusion of external obsolescence as a factor. These significant differences reveal the considerable subjectivity of this approach due to the disparate treatment of depreciation.
In order to understand Goodman's viewpoint that external obsolescence should be considered as a factor in valuation, one must consider the nature of depreciation. Depreciation may be considered as either an accounting or an economic concept. As an accounting concept, depreciation relates to the recovery of costs. Thus, the owner of property used in business is permitted to depreciate that property over its useful life as a means to recover its acquisition cost. To effectuate this tax policy, the IRS has created depreciation schedules for different classes of property, allowing business property owners to depreciate property in accordance with the appropriate schedule by classification notwithstanding the actual economic utility of the asset. When considered as an economic concept, however, depreciation relates to any factor that reduces the value of business property. Thus, from an economic perspective, depreciation may include such considerations as physical deterioration, functional obsolescence caused by technological change, and external factors which negatively impact on the economic utility of business assets. It is this last factor, sometimes known as economic obsolescence, which is controversial. Goodman argues that the factor of regulation operates to reduce the value of the plaintiffs' property. His argument has received some professional approbation. the text TheAppraisal of Real Estate,[7] the author notes: "Depreciation is a loss in property value from any cause. It may also be defined as any difference between reproduction cost or replacement cost and market value. Deterioration, or physical depreciation, is evidenced by wear and tear, decay, dry rot, cracks, encrustations, or structural defects in a building. Other types of depreciation are caused by obsolescence, which CT Page 5482 may be either functional or external. Functional obsolescence may be caused by the inadequacy or superadequacy of a building site, style or mechanical equipment. Physical deterioration and functional obsolescence can usually be observed in the improvement. External obsolescence is caused by factors outside the property such as changes in demand, general property issues in the area, zoning, financing, and government regulation." p. 376. While this text is a discussion of real estate valuation, the point that external obsolescence may be considered as affecting value is no less germane to personal property than to realty.
Goodman posited that the government regulation of the plaintiffs' property is a cause of external or economic obsolescence which must properly be considered in determining value, and he calculated this factor by measuring the difference between the rate of return on assets allowed by the DPUC and the rate of return a prudent investor would expect to realize on the same assets. Goodman then capitalized this difference and subtracted the resulting sum from the RCNLD calculation to arrive at his estimate if fair market value. This approach is sound. If value is seen as the property's contribution in the marketplace, or its contribution to revenue, it is reasonable to deduct from the reproduction or replacement cost of an asset an amount which takes into consideration the difference between what the asset would generate in a free economy from what it is able to contribute as a result of regulation. In his treatise, Valuationof Railroad and Utility Property, Arlo Woolery suggests that one way to measure economic depreciation, or external obsolescence is to capitalize the income loss resulting from the condition or negative influence. Woolery, Arlo, Valuation of Railroad and Utility Property, (Published in cooperation with The Lincoln Institute of Land Policy and The Wichita Public Utility and Railroad Workshop) at 61. This is the methodology utilized by Goodman and it accounts for the greatest difference between his RCNLD outcomes and those derived by NFMA and Beck, neither of whom considered the fact of regulation in their valuations.
While a reduction in the value of an asset due to government regulation may appear to be an income concept not properly applied when using cost methodology, on closer scrutiny, the approach provides a useful analysis. As a starting point, it can fairly be said that the original cost of an asset, standing alone, is not a measure of its present worth. But when the economic value of that asset to the business is directly tied to its original cost, then original cost becomes a relevant valuation factor. Such is the case with DPUC regulation, which, as stated previously, uses original cost as the base-point in determining an allowed rate of return. The cost of reproducing or replacing an asset has no such correlation to its economic worth to its business owner. Woolery notes: "Reproduction cost new has been widely used as evidence of value for property in unregulated industries. This estimate of cost spans the time CT Page 5483 period between original construction and the present. It is the cost of constructing a replica of the original property using current prices for labor and materials. The very concept is often criticized on both ideological and procedural grounds. There is no assurance that any property is worth what it would cost to reproduce it new using current prices." Id. at 42.
"In valuing non regulated properties, reproduction cost has a wide range of useful applications if used with skill and understanding. However, making this type of cost estimate is expensive and time consuming. Regulatory authorities and courts are inclined to give it little consideration in determining the base for earnings, so tax administrators have little reason to use it as the basis for ad valorem taxation." Id. at. 42-43. Similarly, with respect to replacement cost methodology, Woolery comments: "Replacement cost, even though it is a useful and reliable tool for valuing properties in a free economy, may have limited utility for valuing transportation and utility property for ad valorem tax purposes. It is expensive, time consuming, and technically demanding. To use this tool effectively, the transportation or utility property would have to be hypothetically redesigned and reengineered to specifications imposed by the current state of the art and current market demand." Id. at 42.
While the RCNLD method was once the prevalent in methodology utilized to value personal property, it is no longer in general use in Connecticut because its formulations are complicated and involve substantial subjectivity in determining appropriate depreciation, and because technological change has made reproduction and replacement costs less reliable indicators of value.[8] Regarding valuation methodology, theHandbook for Connecticut Assessors, published by the Connecticut Association of Assessment Officers in concert with the Office of Policy and Management, recommends the use of the modified cost approach (OCLD) and not RCNLD. "The cost approach to value involves a determination as to the current depreciated cost of personal property. In appraisal theory, the replacement cost new of an item of personal property is adjusted to reflect its condition and utility in order to arrive at an estimate of market value. As a point of departure in this approach to value, Connecticut assessors seldom utilize the replacement cost new other than for items that are new, due to a lack of data sources." Handbook forConnecticut Appraisers, (2000 Ed), 10-8.
The Handbook goes on to state, "It is not recommended that an assessor use trending factors applied against acquisition costs to arrive at an estimate of fair market value. Given the multitude of personal property items to be valued, and the fact that many of them are subject to significant technological obsolescence, these items may actually be CT Page 5484 replaced with more technologically advanced and, more likely, less expensive equipment. Therefore, the assessor must exercise caution when considering the use of trending factors, in that the amount of total depreciation applied is extremely critical it the determination of a final estimate of fair market value." Id.
"Most assessors use a modified cost approach to value wherein the acquisition cost of personal property items is adjusted to reflect accrued depreciation. In the mass appraisal process, this adjustment is accomplished via use of depreciation schedules." Id. While the Handbookfor Connecticut Assessors has no coercive effect on assessors, our courts have looked to the Handbook for guidance and clarification. UnitedIlluminating Co. v. New Haven, 240 Conn. 422 (1997). It is also reflective of practice norms.[9]
In her utilization of trending factors and the RCNLD approach, Hughes of RW Beck was influenced by her perception of the status of Connecticut law. In support of her utilization of the RCNLD method for valuation, Hughes concluded in her report, "Based on the relative merits of the indicators of value developed using the cost, income and market approaches to valuation, and taking into consideration the legal precedent for determining the present true and actual value of utility property as determined by the Supreme Court of Connecticut, we believe that the fair market value of the property for tax assessment purposes is equal to the RCNLD value." The reference to the Connecticut Supreme Court was to its 1974 decision in New Haven Water Company v. Board of Tax Review,166 Conn. 232. At first impression, reliance on New Haven Water Company
appears justified. But it is its underlying principles in addition to its contextual factual determinations which make New Haven Water Company
pertinent today.
In New Haven Water Company, the plaintiff water company had appealed the refusal of the Board of Tax Review to reduce its personal property assessment. The trial court had referred the matter to a committee, Judge P.B. O'Sullivan, who filed a report affirming the Board's action. On appeal, the water company had argued that the assessor was required, as a matter of law, to value the property using the OCLD method of valuation. The Board had confirmed the assessor's valuation on the basis of the RCNLD approach. In affirming the trial court's adoption of the committee report, the Supreme Court noted: "The committee found that the replacement cost less depreciation method is widely used throughout the state, and is used to assess the taxable property of other public service companies." Id. at 237. Additionally, a review of the record and briefs pertaining to this case indicates that at trial there was testimony from the tax assessor, Harry J. Cohen that: "The figures supplied by the plaintiff used by the assessor was replacement cost less depreciation. For CT Page 5485 the grand list of June 1, 1966, the assessor could not have used historical cost less depreciation as a method to arrive at fair market value, because the figures were not supplied to him, and, in fact, the figures supplied to him by the plaintiff were replacement cost less depreciation." Connecticut Supreme Court Records and Briefs, JanuaryTerm, 1974, Appendix 3a, Testimony of Harry J. Cohen, tax assessor. Additionally, there was testimony from Cohen that, "The plaintiff receives the same treatment on personal property assessment as does every other company in New Haven and the same as he did for the U.I. and the Southern Connecticut Gas Company." Id. at 4a. Thus, while in its decision the Supreme Court appeared to support the RCNLD method of valuation as a preferred approach, the decision must be read in light of then prevailing conditions and understood in light of present norms. It must also be understood for its precise holding that the tax assessor was not required, as a matter of law, to value property on the basis of OCLD.
The court finds it meaningful that at the time of the New Haven WaterCompany decision, self reporting by business property owners was on the basis of RCNLD and this was the generally accepted method for valuing personal property. Today, the circumstances are significantly different. Now, the general practice by municipal tax assessors in Connecticut is to request businesses to report their business property on the basis of OCLD and to assess on that basis. Indeed, this was the manner in which Meriden requested information from the plaintiffs. Requesting historical information concerning the date and cost of acquisition is in accord with the guidelines set forth in the Handbook for Connecticut Assessors. In pertinent part, the Handbook states: "The assessment of personal property must be based on its fair market value. Establishing value on the basis of market sales is very difficult due to the lack of bona fide sales data. Historic cost data is likely to be the best economic information that is available to the assessor. The property owner enters the total cost of the personal property by assessment year of acquisition in the schedules on the declaration. This allows the assessor to determine personal property values by use of the modified cost approach." Handbook,10-6. As noted supra, in addition to embracing the modified cost approach to valuation, the Handbook discourages assessors from utilizing the replacement cost approach.
Thus, appraisal practice has markedly changed from 1974 when RCNLD was the normative valuation method. Now it is the exception. Indeed, from trial evidence it is apparent that in all Connecticut municipalities business owners are asked to report their property in terms of acquisition costs less depreciation. In short, tax assessment on the basis of OCLD is now the norm.
In the court's view, there is good reason for the common practice of CT Page 5486 assessors to tax personal property on the basis of OCLD, otherwise known as the modified cost approach. It is substantially less subjective than the RCNLD approach, and can more readily be applied to all taxpayers without undue burden on assessors. On the other hand, the RCNLD approach requires the assessor to trend original cost to then current replacement costs. This entails not only an estimate of current costs, but a determination of the present useful life of an asset, a determination fraught with the risk of subjectivity. This approach does not adequately take into consideration external factors such as technological changes, which would make actual replacement of an asset impractical. And, importantly, the RCNLD approach results in an assessment bearing no reasonable relationship to economic value. If the value of an asset can be measured by its economic contribution, there should be some correlation between the earnings that can be generated by an asset and its value. However, if one were to accept the valuations determined through NFMA or RW Beck and apply a reasonable rate of return to those values, one would project earnings vastly in excess of those realized by either plaintiff. It is significant to the court that the DPUC utilizes, as its rate base, the original costs of assets. If the DPUC were to utilize the replacement or reproduction costs of assets as the basis for determining a reasonable rate of return, the resulting increased costs to utility users would be significant.
In addition, with respect to regulated assets, the plaintiffs submit their personal property declarations to municipalities utilizing the schedules of depreciation approved by the DPUC and not the shorter depreciation schedules suggested on the forms provided by municipal assessors. The form utilized by the Meriden assessor, and in general use in the state, contains depreciation schedules as allowed by the Internal Revenue Service. The depreciation claimed by the plaintiffs in their tax filings, however, is in accordance with depreciation schedules established by the DPUC.[10] Periodically, the DPUC and regulated utilities conduct depreciation studies to determine the actual useful life of regulated assets by categories and, following these studies, the DPUC sets allowable depreciation schedules. These schedules are based on the actual longevity of regulated assets by category which are invariably longer than would normally be allowed by the IRS for tax filing purposes. As a consequence, the net values reported by the plaintiffs to Meriden are higher than they would be if the plaintiffs had simply followed the schedules suggested in the City's declaration forms. And, since the depreciation schedules adopted by the DPUC are based on studies of the actual longevity of assets, the resulting values reported are more realistic than those which are simply subjected to an IRS approved depreciation schedule. Additionally, it is the plaintiffs practice not to depreciate any regulated assets lower than 30% of original cost, no matter how aged, in spite of the fact that the asset could be completely CT Page 5487 written off for IRS purposes. This practice inures to the benefit of municipal to taxing authorities and operates as a hedge against inflation.
The modified cost method, which is based on OCLD, has been criticized as merely an accounting expedient unrelated to true value. When depreciation is based solely on IRS schedules, this criticism may be valid. But in the case of regulated assets, such as those of the plaintiffs', the depreciation schedules are derived by the DPUC on the basis of the actual economic life of asset groups. And, as noted supra, when determining the rate of return the plaintiffs may be allowed to earn on their assets, the DPUC considers the original and not the replacement cost of these assets.
In the court's view, the methodology employed by the vast number of assessors in Connecticut, the methodology recommended by the Connecticut Association of Assessment Officers, and the methodology generally applied to all other personal property subject to taxation in Meriden is the appropriate methodology to determine the fair market value of the plaintiffs' personal property. And that is the methodology, known as the modified cost approach, requested by the assessor and provided to the assessor by the plaintiffs in all the tax years in question.
In reaching this conclusion the court has also considred the income and comparable sales approaches to valuation. To value property by the income approach one must calculate the present value of anticipated future earnings. To make this computation, one must determine the earnings and then discount them to a present valuation. Thus, the present value of an asset is derived by determining the earnings on may realize from the asset and then discounting those earnings to their present value. As pointed out by Nancy Hughes of RW Beck, "the income value for a regulated utility should equal its rate base value, since this is the value of the utility's investment on which it is allowed to earn its authorized rate of return or profit." Defendant's Exhibit 1112, RW Beck Report, 4-3. The court agrees. Hughes also correctly notes that the income approach is based on a return on all the plaintiffs' assets, then prorated to Meriden, and some of these assets may have been more profitable than others. For example, she commented that in certain of the tax years in question, CLP maintained unprofitable generation facilities which, when taken into consideration as part of a system-wide income analysis, artificially deflated income. Therefore, she argued, it would be inappropriate to value CLP's assets in Meriden using its proportionate income based on its proportionate share of assets, if it contained none of the non-income producing generation facilities. The court agrees. The lack of profitability of assets located outside of Meriden should not be a factor in determining the income reasonably derived from assets CT Page 5488 situated in Meriden. For these reasons, the court believes that the income approach is not a reasonable sole indicator of value. It is useful to consider in conjunction with cost methodology and, in this regard, it generally correlates to the values established using OCLD methodology.
The court also considered the comparable sales met nod of valuation and found it to be the least reliable indicator of value because of the absence of comparable sales of regulated utility property alone. In its report, RW Beck detailed several utility company sales to demonstrate that utility distribution facilities sold at an average sales price 1.8 times greater than book value. Hughes urges the point that because utility companies sell at more than book value, the modified cost approach is not a reliable indicator of value. The court disagrees. The assessment of personal property is limited to tangible property. A stock sale of a utility business, however, typically involves the sale of a going business with attendant good will with a work force in place. Understandably, no witness was able to report a comparable sale of tangible personal property only. And yet, to include, as a comparable, the unidentified worth of intangible assets, makes the comparison of little use. For the same reasons, reference to the pending merger between Con Edison and Northeast Utilities and to the sale of Yankee Gas are unhelpful. In both these stock ventures, the sales price is not solely a function of the value of taxable personal property, but more generally of the anticipated revenues and profitability of companies, a determination flowing from many considerations which include but are not limited to the companies' tangible assets.
The plaintiffs' filings for their regulated personal property for the tax years 1991 through 1999 were based on OCLD as allowed by the DPUC.[11] As noted, the court believes that this manner of reporting was appropriate and the most reflective of the value of the plaintiffs' regulated assets. The defendant has failed to meet the burden of proving any of its special defenses. Similarly, the defendant's counterclaims fail for want of proof. Accordingly, the court finds the fair market value of the plaintiffs' personal property was as filed by the plaintiffs in their self-reporting,[12] as follows:
 YANKEE GAS CLP Year FMV Year FMV 1991 12,378,015 1991 19,199,547 1992 15,383,266 1992 21,137,228 1993 20,945,241 1993 21,160,273 1994 21,256,736 1994 19,905,721 1995 23,872,393 1995 20,729,322 1996 21,862,963 1996 21,269,365 CT Page 5489 1997 22,590,375 1997 25,597,325 1998 20,775,836 1998 27,261,492 1999 25,354,745 1999 27,529,829
Pursuant to both § 12-117a and § 12-119, the court has the discretionary authority to award pre-judgment interest to a taxpayer whose property has been overassessed. Sears, Roebuck and Company v. Boardof Tax Review, 241 Conn. 749 (1997). In their prayers for relief, the plaintiffs seek interest. During the course of the rial, they submitted exhibits setting forth their respective interest claims. In light of the factual determinations supra, the court finds that an award of interest is equitable in this case.
In determining what rate of interest should apply, which is also discretionary, the court looks to C.G.S. § 37-3a for guidance. Sears
at 764. C.G.S. § 37-3a provides, in relevant part, that "interest at a rate of ten percent, and no more, may be recovered and allowed in civil actions." In exercising its equitable authority, a trial court may consider all relevant information. Given the conduct of the defendant and the time period of overassessment, the court finds that an interest rate of eight percent is appropriate. Accordingly, judgment may enter for the plaintiffs on those counts relating to C.G.S. § 12-117a and § 12-119
as noted in the following charts.

 CLP
 AUDIT YEARS 1991-1994

 LIST TAXES INCREASE AMOUNT DATE REFUND 8% INTEREST TOTAL
 YEAR BASED ON BASED ON OF PAID DUE PER THROUGH REFUND
 SELF- § 12-53 INCREASE DIEM 4/20/01 DUE
 REPORTING AUDIT PAID RATE
 1991 868,859 798,006 598,504 12/15/95 598,504 131.18 255,938 854,442
 INTEREST 0 442,893 332,170 12/15/95 332,170 72.81 142,046 474,216
 1992 667,302 614,299 460,724 12/15/95 460,724 100.98 197,019 657,743
 INTEREST 0 230,362 172,772 12/15/95 172,272 37.86 73,882 246,654
 1993 530,276 488,157 366,118 12/15/95 366,118 80.25 156,564 522,682
 1994 498,837 459,214 172,205 12/15/95 344,411 37.74 141,352 485,763
 172,206 1/31/96
 TOTAL REFUND DUE $3,241,500
 YANKEE GAS
 AUDIT YEARS 1991-1994

 LIST TAXES INCREASE AMOUNT DATE REFUND 8% INTEREST TOTAL
CT Page 5490
 YEAR BASED ON BASED ON OF PAID DUE PER THROUGH REFUND
 SELF- § 12-53 INCREASE DIEM 4/20/01 DUE
 REPORTING AUDIT PAID RATE
 1991 558,867 1,074,933 806,200 12/15/95 806,200 176.70 344,820 1,151,020
 INTEREST 0 596,588 447,441 12/15/95 447,441 98.07 191,375 638,816
 1992 485,649 934,104 700,578 12/15/95 700,578 153.55 299,645 1,000,233
 INTEREST 0 350,289 262,717 12/15/95 262,717 57.58 112,367 375,084
 1993 524,888 1,009,575 757,181 12/15/95 757,181 165.96 323,854 1,081,035
 1994 532,694 1,024,590 384,221 12/15/95 768,442 168.42 324,828 1,093,270
 384,221 1/31/96
 TOTAL REFUND DUE $5,339,448

Therefore, for the audit years 1991-1994, Meriden is ordered to pay to CLP $3,241,500 principal and interest. Meriden is ordered to pay to Yankee Gas, for the same years, $5,339,448 principal and interest.

 CLP
 REVALUATION YEARS 1995-1999

 (A) (B) (C)=75%B (D) (E)=(C)-(A) (F) (G) (G) +(E)
 LIST TAXES TAX IMPOSED TOTAL DATE REFUND 8% INTEREST TOTAL
 YEAR BASED ON BY § 12-55 TAX PAID PAID DUE PER THROUGH REFUND
 SELF- REVALUATION DIEM 4/20/01 DUE
 REPORTING RATE
 1995 519,477 997,077 373,903 7/31/96 228,230 50.05 81,622 309,952
 373,904 1/31/97
 1996 533,010 1,023,053 383,645 7/31/97 234,280 51.34 65,005 299,285
 383,645 1/31/98
 1997 641,469 1,231,216 461,706 7/31/98 281,443 61.79 55,675 337,618
 461,706 1/31/99
 1998 683,173 1,311,272 983,454 1/31/00 300,281 65.82 29,220 329,501
 1999 778,544 1,171,082 439,156[13]7/31/00 49,884 10.94 2,875 52,759
 TOTAL REFUND DUE $1,329,115
 YANKEE GAS
 REVALUATION YEARS 1995-1999

 (A) (B) (C)=75%B (D) (E)=(C)-(A) (F) (G) (G) +(E)
 LIST TAXES TAX IMPOSED TOTAL DATE REFUND 8% INTEREST TOTAL
 YEAR BASED ON BY § 12-55 TAX PAID PAID DUE PER THROUGH REFUND
CT Page 5491
 SELF- REVALUATION DIEM 4/20/01 DUE
 REPORTING RATE
 1995 598,242 1,748,909 655,841 7/31/96 713,440 156.37 255,203 968,643
 655,841 1/31/97
 1996 547,886 1,602,005 600,752 7/31/97 653,618 143.26 181,516 835,134
 600,752 1/31/98
 1997 566,115 1,655,304 620,739 7/31/98 675,363 148.02 133,526 808,889
 620,739 1/31/99
 1998 520,642 1,522,344 1,141,758 1/31/00 621,116 136.13 60,689 681,805
 1999 717,032 1,477,036 533,900 7/31/00 195,384 42.82 11,228 206,612
 TOTAL REFUND DUE $3,501,083

Therefore, for the revaluation years 1995-1999, Meriden is ordered to pay to CLP $1,329,115 principal and interest. Meriden is ordered to pay to Yankee Gas, for the same years, $3,501,083 principal and interest.
Pursuant to C.G.S. § 52-192a, the plaintiffs filed offers of judgment for each of the tax years subject to this litigation. The defendant did not accept any of the offers. Since the offers of judgment were couched in terms of fair market value, and not in damages, the court awards offer of judgment interest only for those years in which the value posited in the offer of judgment is greater than the fair market value found by the court. Accordingly, the plaintiffs are entitled to interest at the statutory rate of twelve percent from the date of the filing of the offers as follows:
 CLP YEAR FMV OFFER OF DATE 12% PER INTEREST JUDGMENT FILED DIEM DUE RATE[14]
 1991 19,199,542 20,600,000 5/17/99 436.82 307,521 1992 21,137,228 22,200,000 5/17/99 297.34 209,327 1993 21,160,271 22,100,000 5/17/99 171.84 120,975 1994 19,905,700 18,600,000 5/17/99 N/A 0 1995 20,729,322 20,600,000 5/17/99 N/A 0 1996 21,269,365 20,500,000 5/17/99[15] N/A 0 1997 25,597,325 25,000,000 12/18/00 N/A 0 1998 27,261,491 28,300,000 12/18/00 108.33 13,325 1999 27,529,829 29,800,000 12/18/00 17.35 2,134
 YANKEE GAS
CT Page 5492 YEAR FMV OFFER OF DATE 12% PER INTEREST JUDGMENT FILED DIEM DUE RATE
 1991 12,378,015 13,300,000 5/17/99 588.44 414,261 1992 15,383,266 16,200,000 5/17/99 452.16 318,318 1993 20,945,242 23,400,000 5/17/99 355.41 250,209 1994 21,256,732 21,700,000 5/17/99 359.43 253,039 1995 23,872,392 26,900,000 5/17/99 318.46 224,196 1996 21,862,963 24,000,000 12/18/00 274.56 33,771 1997 22,590,375 23,400,000 12/18/00 265.94 32,711 1998 20,775,836 23,900,000 12/18/00 224.16 27,572 1999 25,354,745 26,400,000 12/18/00 67.93 8,355
Therefore, Meriden is ordered to pay $653,282 to CLP and $1,562,432 to Yankee Gas as interest on the offers of judgment.
The fifth count constitutes a claim of civil conspiracy. The plaintiffs allege that the defendant conspired with NFMA to violate the taxpayers' constitutional rights and to engage in conduct by way of illegal and improper means in an attempt to illegally and improperly benefit from such activity. In order to prove a civil conspiracy, the plaintiffs must demonstrate that the defendant combined with NFMA to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, that one of them acted pursuant to the scheme in furtherance of its purpose, and that the act caused harm to to the plaintiffs. Marshak v. Marshak, 226 Conn. 652
(1993); Williams v. Maislen, 116 Conn. 433 (1933). While the court believes that the assessor did, in fact, abdicate his statutory responsibilities to value the plaintiffs' properties, and that the processes utilized by NFMA and Meriden did ultimately harm the plaintiffs, the plaintiffs' proof fails to establish that the offending acts were the products of a conspiracy between Meriden and NFMA, or between any of Meriden's employees and NFMA.
The plaintiffs seek a declaratory judgment that the contingent fee arrangement between Meriden and NFMA is void because it violates public policy. Pursuant to C.G.S. § 52-29 and Practice Book § 17-55, a declaratory judgment will be rendered only where a claimant:
 a) has a legal or equitable interest by reason of danger or loss or uncertainty as to his rights or there is an actual bona fide and substantial dispute or substantial uncertainty of legal relations which requires settlement between the CT Page 5493 parties, and
 b) all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof, and
 c) the court is not of the opinion that the parties should be left to seek redress by some other form of procedure.
In regard to this requested relief, the plaintiffs provided notice to NFMA. While other municipalities have not been given notice, the court believes that notice to NFMA is adequate to render declaratory judgment regarding the specific contract in question.
Public policy may be found in constitutional or statutory provisions or in judicially conceived notions. Daley v. Aetna Life and Casualty Co.,249 Conn. 766, 798 (1999). Connecticut has not adopted legislation prohibiting the use of contingent fee arrangements in personal property tax audits.[16]
As discussed supra, the Office of Policy and Management (OPM), in conjunction with the Connecticut Association of Assessing Officers, publishes the Handbook for Connecticut Assessors. OPM's mission is to provide information and analysis that the Governor uses to formulate public policy goals for the state of Connecticut and [to] assist . . . municipalities in implementing policy decisions on behalf of the people of Connecticut." Handbook, 1-3. While the Handbook does not speak to the propriety of contingent fee audits, it incorporates the regulations of the International Association of Assessing Officers (IAAO). The IAAO has adopted the ethical standards of USPAP, which restricts the use of contingent fee arrangements when an opinion of value will be rendered. The defendant's own experts, Hughes, Swanton and Parker, stated that they would not perform an appraisal or an audit on a contingent fee basis.
The power to tax is a uniquely governmental function and is vested in individuals who are directly accountable to the people through the political process. There exists a public policy in favor of fair and accurate taxation which has been recognized by our Supreme Court.Robertson v. Stonington, 253 Conn. 255 (2000). "The people's entitlement to fair and impartial tax assessments lies at the heart of our system, and, indeed, was a basic principle upon which this country was founded."Sears, Roebuck Co. v. Parsons, 260 Ga. 824, 401 S.E.2d 4 (1991).
"Fairness and impartiality are threatened where a private organization has a financial stake in the amount of tax collected as a result of the CT Page 5494 assessment it recommends." Id. When an auditor is hired based on a contingent fee basis, there is an inherent and initially unfounded assumption that the original assessment was wrong, and it creates an incentive to determine its inaccuracy and to increase the assessment.[17]
Contingent fee arrangements may very well lead to unfair results, as in the instant case. NFMA, working on a contingent fee basis and aware that the valuation methodology which would produce the highest property values was RCNLD, ostensibly set out to do an audit but, in fact, did not look for omitted property or value and, most importantly, asked its retained experts only to conduct a RCNLD study and not to conduct an audit or valuation.
When a municipality enters into a contingent fee contract with a third party to determine the tax obligations of its citizenry, it is essentially entering into a partnership with a party who has a pecuniary interest in the amount of taxes assessed. Although, theoretically, when a municipality enters into a contingent fee arrangement with a firm to do a personal property valuation for tax assessment purposes the ultimate responsibility for assessment remains with the assessor, the cornerstone from which the assessor begins his statutory exercise of judgment and discretion is the value recommended by the contingent fee auditor. There is a high risk that the process may become tainted with the influence of the third party who maintains a direct financial interest in keeping that value high. There is an attendant likelihood that consequence of any resulting assessment will be skewed.
The contract between NFMA and Meriden goes further than just the audit. The agreement provides that the City shall not compromise any of the assessments without providing NFMA a meaningful opportunity to participate in the discussions and negotiations. This agreement belies the bedrock notion that the power to tax must lie solely with the assessor. Neither NFMA nor any other firm hired a contingent fee basis is likely to have any interest in compromising the assessment value once determined. In entering into such an arrangement, the focus shifts from serving the public good to generating the highest revenue from the citizenry.
In this matter the plaintiffs ask for a determination not that all contingency fee contracts between a municipality and an outside audit or appraisal company be declared void but, more specifically, that this particular contract violates public policy. Though the court has found much to criticize in the contents and operation of the contract between NFMA and the defendant municipality, the contract, by its own terms, is not operative beyond the 1994 tax year. Therefore, its potential for harm is extinguished. Additionally, the court believes that the economic relief accorded the plaintiffs in this matter fully vindicates their CT Page 5495 legal rights. Finally, the court has made numerous factual findings consistent with the plaintiffs' requested declaratory relief. Accordingly, for the reasons stated, the court declines to enter a declaratory judgment.
Judgment may enter accordingly.
Bishop, J.